Gants, J.
On July 28, 2000, Mercedes Gonzales, on behalf of her children, filed this action against the defendants Ronald W. Arsenault and Thelma L. Arsenault, individually and as trustees of Park Place Really Trust II, and/or the Arsenault Realty Trust (collectively “the Arsenaults"), seeking damages for the harm her children suffered as a result of lead paint poisoning they allegedly sustained while living in an apartment owned by the Arsenaults. On August 16, 2002 the Arsenaults filed claims as third-party plaintiffs against their liability insurers — First Financial Insurance Company (“First Financial”) and Monticello Insurance Company (“Monticelllo”) — claiming that these insurers breached their insurance contracts by wrongfully relying on the lead paint exclusion in those contracts to deny coverage of the lead paint poisoning claims and refuse to provide a defense. The Arsenaults also filed third-party claims against their insurance brokers, Hilb, Rogal and Hamilton Insurance Agency of Massachusetts, Inc. (“Hilb, Rogal”) and Bradley P. Howes (“Howes”), alleging that Hilb, Rogal breached its contract to procure insurance covering all liability claims, including lead paint liability claims, and that Hilb, Rogal and Howes were negligent in failing properly to insure the Arsenaults against lead paint liability claims. Hilb, Rogal and Howes (collectively “the Insurance Brokers”), now move for summary judgment on all the third-party claims brought against them. After hearing, for the reasons set forth below, the Insurance Brokers’ motions are ALLOWED in part and DENIED in part.
BACKGROUND
In evaluating a motion for summary judgment, I must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmoving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to the Arsenaults and should not be misunderstood as findings of the Court.
1. The Arsenaults’ Liability Insurance
From 1958 until 1998, Ronald W. Arsenault was a real estate broker with an office in Waltham, primarily engaged in selling new, single-family homes. He shared the office space with his old friend and insurance broker, Charles Pintabone (“Pintabone”), who operated the Pintabone Insurance Agency. At some time in the 1960s, Arsenault and Pintabone decided to enter into a partnership to purchase and manage residential investment real estate. As partners, Arsenault and Pintabone in 1967 purchased a building located at 99 Robbins Street in Waltham (“the Robbins Street building”).[1] Approximately five years later, the partnership created the Park Place Realty Trust I, and the Robbins Street building was held in this Trust. Pintabone, in his capacity as an insurance broker, placed the fire and liability insurance policies for the investment properties, including the Robbins Street building.
In the early 1970s, for reasons that are not clear from the record, Pintabone lost his ability to place fire and liability insurance for their investment properties, although he retained the ability to place other types of insurance. As a result, Pintabone introduced to Arsenault another insurance broker, Bradley Howes, and explained to Arsenault that Howes had the experience and contacts needed to place the insurance that he could no longer place. Pintabone added that Howes would be placing fire and liability insurance for all his insurance clients. Although the details of the financial arrangement between Pintabone and Howes were never made explicit to Arsenault, he understood (correctly) that Pintabone was receiving a commission on all the insurance placed for him by Howes.
In the late 1970s, Arsenault and Pintabone dissolved their partnership due to Pintabone’s failing health. Pintabone thereafter conveyed his interest in the Robbins Street building to Arsenault, who transferred the property from the Park Place Realty Trust I to the Park Place Realty Trust II, with himself and his wife as trustees. Even after their real estate partnership dissolved, Pintabone continued until his death in October 2001 to handle all of the Arsenaults’ insurance matters, except that Howes continued to place the fire and liability insurance for the Arsenaults’ investment properties.
Over the years, Howes worked for many different firms and at times owned his own agency. During each of Howes’ many employment transitions, he continued to place the Arsenaults’ fire and liability insurance for his investment properties without interruption. At no time did the Arsenaults deal with anyone but Howes or Pintabone regarding these policies. Relevant to the instant motion, Howes worked for the Caddell & Byers Insurance Agency (“Caddell & Byers”) from 1988 to 1991, serving as its Chief Operating Officer. Caddell & Byers is the predecessor of the Phoenix Insurance Agency, which is the predecessor of the named third-party defendant, Hilb, Rogal. Although Howes testified that, as Chief Operating Officer, he had no account responsibility, there is evidence that Caddell & Byers continued to place the liability and fire insurance policies for the Robbins Street building and that the Arsenaults continued to rely on Howes to handle that placement. From 1991 to 1993, Howes served as a consultant for the Hatch, Anderson, O’Donnell Insur *369 anee Agency. In 1993, he opened his own insurance agency, the Howes Insurance Agency.
Mr. Arsenault, though an experienced real estate broker, did not have extensive experience with or knowledge of insurance. He relied entirely on Pintabone and Howes to handle his insurance needs regarding the Robbins Street building, even after Pintabone no longer held an ownership interest in that property. He did not read or review the policies that were issued, relying on Pintabone and Howes to ensure that he obtained the appropriate coverage. Mr. Arsenault never orally discussed insurance matters with Howes, but Howes would correspond directly with Arsenault with respect to the fire and liability insurance on the Robbins Street building. Typically, Howes would obtain a quote from an insurance company and send it directly to Mr. Arsenault, along with a bill which was to be paid directly to Howes’ own insurance agency or the agency with whom he was then working. If the insurance company required an application, Howes sent the application directly to Mr. Arsenault. If Arsenault received an invoice from Howes, he either mailed payment directly to Howes or delivered it to Pintabone, who in turn delivered it to Howes.
Mr. Arsenault knew Howes had placed liability insurance for the Robbins Street building, and assumed that it covered all the liabilities he would face as to that property. He never specifically asked Howes or Pintabone whether the liability insurance included coverage for lead paint poisoning; nor did he specifically consider whether lead point poisoning was covered. Neither Howes nor Pintabone ever reviewed the liability policy with him, or explained to him which risks were covered and which were excluded. If Howes or Pintabone had told him that his liability policy did not cover lead paint poisoning claims, he would have sought such coverage from other insurance companies or agents.
In fact, the liability polices issued by Monticello, through Howes, for the Robbins Street building for the period from March 13, 1991 through March 13, 1993 contained a specific exclusion for lead paint liability, as did the liability policies issued by First Financial for the period from March 13, 1993 through March 13, 1995. It is less clear whether the earlier liability policies contained an exclusion for lead paint liability. Caddell & Byers does not routinely discard any of its records, but it was unable to locate the Arsenaults’ file in discovery, which permits the inference that Howes took that file with him when he left. Howes testified that he did not know whether the liability policies he placed for Arsenault at the Robbins Street building for the period before March 13, 1991 contained a lead paint liability exclusion, and did not produce any records which resolve this issue. In at least the early 1980s, Howes had obtained liability insurance from the Hanover Insurance Company for the Robbins Street building. Arsenault attests in his November 24, 2003 affidavit that the Hanover liability policy did not contain a lead paint liability exclusion, and believes that his liability policies began to include such an exclusion at some time between 1989 and 1990. In his March 14, 2003 deposition, however, he said he had no knowledge as to the content of any exclusions in any liability policy or as to whether any liability policy did or did not contain a lead paint liability exclusion. His affidavit fails to explain how he now recalls the content of those policies or the source of his new insight.
2. Gonzales’ Lead Paint Liability Claims
Mercedes Gonzales lived with her three minor children — Marcos Espinal, Enrique Pena, and Heruy Pena— at the Robbins Street building from approximately October 1992 through March 1995.[2] The building was jointly and severally owned and controlled by the Arsenaults at all relevant times. On June 2, 1994, through counsel, Ms. Gonzales presented Mr. Arsenault with a Notice of Claim which informed him that she was seeking compensation for the harm her children suffered as a result of lead paint poisoning allegedly sustained while living at the Robbins Street building.
Upon receipt of the Notice of Claim, Mr. Arsenault informed Pintabone of the claim, who forwarded the Notice of Claim to Howes. On February 8, 1995, Arsenault was informed that the liability insurance placed on the Robbins Street building contained an exclusion for lead paint related risks and that his claim had been denied on this basis.
On June 16, 1997, Mr. Arsenault received a G.L.c. 93A demand letter from Ms. Gonzales regarding the alleged lead poisoning of her children. The letter requested a copy of the liability insurance policy for the Robbins Street building and demanded damages in the amount of $350,000. On June 24, 1997 Arsenault retained attorney David Govemo, who responded to the demand letter on June 27, 1997. Given the lack of any medical documentation whatsoever and the amount of money requested, Arsenault declined to make an offer of settlement. Ms. Gonzales did not file suit or otherwise respond to attorney Governo’s reply until July 28, 2000, nearly six years after the initial Notice of Claim, when the instant action was initiated.
DISCUSSION
. The Arsenaults have brought third-party claims against Hilb, Rogal alleging both breach of contract and negligence, but have alleged only negligence against Howes. This Court will first address the breach of contract claim against Hilb, Rogal and then address the more interesting issues raised by the negligence claim.
1. Hilb, Rogal’s Alleged Breach of Contract to Procure Insurance Coverage as Requested
An insurance agent may be held liable in contract for his failure to procure insurance as requested by the insured. Rae v. Air-Speed Inc., 386 Mass. 187, 194 (1982). “When an insured makes an agreement with a broker calling for the purchase of particular coverage, the insured may reasonably rely on the broker’s supe *370 rior expertise and may assume that the broker has performed his duty.” Campione v. Wilson, 422 Mass. 185, 195 (1996). Consequently, for Arsenault to prevail on its breach of contract claim against Hilb, Rogal, there must be evidence either that:
1. Mr. Arsenault in some fashion directed Howes or another agent of Caddell & Byers (Hilb, Rogal’s predecessor in interest) to obtain general liability insurance for the Robbins Street building that did not exclude lead paint liability or, if no such general liability insurance were available, separate lead paint liability insurance. See Rayden Engineering Corp. v. Church, 337 Mass. 652, 660 (1958) (principal-agent relationship imposes upon broker a duty to proceed in accordance with instructions and to report any part of those instructions that are not being performed), or
2. that Howes or another agent of Caddell & Byers represented to Arsenault that they would obtain such coverage and failed to do so. See, e.g., Bicknell, Inc. v. Havlin, 9 Mass.App.Ct. 497 (1980) (broker made an assertion that property owner reasonably understood to mean that he would add $100,000 of blanket coverage covering all the plaintiffs warehouses but instead procured $50,000 of specific coverage on each of two warehouses).
There is no such evidence in the summaiy judgment record. Arsenault admits that he never directed Howes or any other agent of Caddell & Byers to procure lead paint liability coverage. Indeed, he admits that he never had any discussion with them as to this coverage. Consequently, there is no evidence of any agreement to obtain such coverage that Caddell & Byers breached by failing to do so. Without such evidence, the Arsenaults have no reasonable expectation of prevailing at trial on their breach of contract claim. See generally Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991) (the moving party is entitled to summary judgment if it “demonstrates ... that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case”). Therefore, Hilb, Rogal’s motion for summary judgment on the third party contract claim (Count III) is ALLOWED.
2. The Negligence Claims Against Howes and Hilb, Rogal a. Breach of the Duty of Care
Howes and Hilb, Rogal argue that, in the absence of “special circumstances of assertion, representation, and reliance,” which they contend are plainly not present here, the only duty of care that an insurance broker owes to his client is to act reasonably to procure the insurance that the client requests. Since there is no evidence that the Arsenaults requested anyone to procure lead paint liability coverage, they contend that the Arsenaults’ negligence claim is as doomed to failure as their breach of contract claim.
To understand how Massachusetts law presently defines the duty of care of an insurance broker, it is important to see how that case law has evolved. In general, under black letter agency principles, “(a]n agent is bound to use due care in the implementation of the agency . . . and in carrying out instructions of the principal-client.” Bicknell, Inc. v. Havlin, 9 Mass.App.Ct. at 500 (citation omitted). The establishment of a principal-agent relationship imposes on the agent “a duty to proceed in accordance with instructions and to report what was not being done under those instructions.” Rayden Engineering Corp. v. Church, 337 Mass. at 660. See also Rae v. Air-Speed, Inc. 386 Mass. at 192 (the “well settled rule (is) that an insurance agent or broker who, with a view to compensation for his services, undertakes to procure insurance for another, and through his fault and neglect fails to do so, will be held liable for any damage resulting therefrom,” quoting Ann ot., 64 A.L.R.3d 398, 404, 410 (1975)). Therefore, at a minimum, an insurance broker has a duty to act reasonably to do what he is told by his client or to report to the client when he is unable to comply with those instructions.
When there are “special circumstances of assertion, representation and reliance,” the duty of care owed by an insurance broker to his client goes beyond this bare minimum. See Rapp v. Lester L. Burdick, Inc., 336 Mass. 438, 438-39 (1957); McCue v. Prudential Ins. Co. of America, 371 Mass. 659, 661 (1976). “The nature and extent of the duty of care owed by an independent insurance agent to his client depends in part, at least, upon the degree of skill which he represents himself to possess.” Bicknell Inc. v. Havlin, 9 Mass.App.Ct. at 500. Therefore, when an insurance broker describes himself as experienced in the insurance business, handles all of a client’s insurance coverages, and freely makes advice and recommendations as to particular types of coverage, the broker reasonably is expected to state clearly to the client whether he is obtaining an additional $100,000 in blanket coverage for all the client’s warehouses, or $50,000 on each of two new warehouses, and may be held liable for the losses that arose from the client’s misunderstanding. Id. at 499-500. Similarly, when the agent of an insurance company that has provided health insurance to the insured for 28 years tells the insured that a medical report from the family’s doctor is needed for the new health insurance policy being applied for, but fails to inform the insured that the application would be rejected if the medical report were not received within 45 days, the insurance company breached its duly of care when that deadline was allowed to pass without warning or comment. McCue v. Prudential Ins. Co. of America, 371 Mass. at 660-61. As another example, when an insurance broker who holds himself out as knowledgeable in the field of construction industry insurance fails to advise his construction company client that, in the absence of specific direction, he was not going to renew a builder’s risk policy even though he knew that the client construction company had yet to complete the project, the broker is liable for the loss of *371 insurance coverage that arose when the policy was not renewed. Construction Planners, Inc. v. Dobax Ins. Agency, Inc., 31 Mass.App.Ct. 672 (1991). While each of these cases are different, they articulate a general theme: When the insurance broker claims special knowledge about either the insurance industry or the insurance needs of a particular type of business, or has a longstanding relationship with the client, or has otherwise fostered a relationship in which the client has come to rely on the broker to help him procure necessary and appropriate insurance, the duty of care of such an insurance broker includes a duty to be reasonably clear in informing the client as to what he has done and what he has not done, as to when there is coverage and when there is not, especially when the client otherwise reasonably would be mistaken in his assumption as to what the broker had done and whether there was coverage.
To be sure, a broker, in the absence of guidance from his client, is under no general duty to obtain insurance coverage for the client that the broker believes the client should have or to renew an insurance policy. Nor is there a general duty for an insurance broker to become a full-fledged insurance advisor or consultant, in the absence of additional compensation for such advice. See Baldwin Crane & Equipment Corp. v. Riley & Reilly Insurance Agency, Inc., 44 Mass.App.Ct. 29, 31-32 (1997); Robinson v. Charles A. Flynn Insurance Agency, Inc., 39 Mass.App.Ct. 902 (1995) (rescript) (without special circumstances of assertion, representation, and reliance, insurance broker has no duty to advise client as to the availability of different types of motor vehicle coverage).
Yet, when there are “special circumstances of assertion, representation and reliance,” such that the client has come to rely on the experience and expertise of the insurance broker, a broker’s duty of care includes at least the duty to inform the client of coverage that a client of reasonable prudence should have but which the client has not yet obtained, and timely to notify the client that a policy has not been renewed or has been renewed with lesser coverage. See generally Construction Planners, Inc. v. Dobax Ins. Agency, Inc., 31 Mass.App.Ct. at 675-77. This modestly heightened duly of care respects the client’s role as the ultimate arbiter of the insurance he procures, yet recognizes that a client reasonably may rely on an insurance broker to help him understand his insurance needs and the arcane language, shorthand, and codes used in insurance policies and correspondence. It also recognizes that, when a broker induces a client to place policies through him because of his experience and expertise, he reasonably is expected to exercise the care that comes from such experience and expertise, for which he is earning a commission.
Whether there exist “special circumstances of assertion, representation and reliance” that trigger this modestly heightened duty is generally a jury question. McCue v. Prudential Ins. Co. of America, 371 Mass. at 661. “Facts relevant to this inquiry include (1) the complexity and comprehensiveness of the insurance business; (2) whether a continuing relationship had existed between [the broker and client] over a period of years; (3) the frequency of contact [the broker] had with [his client] to attend to his insurance needs; and (4) the extent to which [the client], because of the complexity of the policies, had come to rely on the advice of [the broker].” Schwartz v. The Travelers Indemnity Company, 50 Mass.App.Ct. 672, 680-81 (2001). Here, there is more than sufficient evidence in the summary judgment record to create a genuine dispute of fact on this issue. There is evidence that Howes held himself out as an expert on insurance matters, that he had handled the Arsenaults’ fire and liability insurance for roughly twenty years before Ms. Gonzalez and her children moved into the Robbins Street building, and that Mr. Arsenault relied entirely on Howes and Pintabone to make sure that he was properly insured for this property.
If the juiy were to find that there were indeed “special circumstances of assertion, representation and reliance,” the jury may also reasonably find that Howes (and, through him, Hilb, Rogal) breached the heightened duty of care in at least two ways. First, it may find that Howes had a duty to inform Mr. Arsenault as to whether he did or did not have lead paint liability coverage, so that Arsenault could have made an informed decision as to whether to procure such coverage. Second, if it finds that Arsenault’s general liability insurance in the 1980s did not include a lead paint liability exclusion, the jury may find that Howes had a duty to inform Arsenault that a renewed or new general liability policy now included that specific exclusion. Therefore, to the extent that Howes and Hilb, Rogal contend that they are entitled to summary judgment on the negligence claims because they did not have any duty of care that was arguably breached, that argument is rejected.
b. Statute of Limitations
Howes and Hilb, Rogal have offered an alternative ground for summary judgment — that the three-year statute of limitations has run on the negligence claims because Mr. Arsenault knew by February 8, 1995 that there was a lead paint liability exclusion in the general liability insurance policies that were in effect while Ms. Gonzalez and her children resided in the Robbins Street building and retained counsel on June 24, 1997 ' to respond to Ms. Gonzalez’s G.L.c. 93A demand letter, but did not file suit in this action until July 2000, more than three years later.
In general, the statute of limitations begins to run when the plaintiff receives notice of the injury “and knows or reasonably should have known that it sustained appreciable harm as a result of the defendant’s negligence.” Int’l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 29 Mass.App.Ct. 215, 218 (1990). Here, Mr. Arsenault received notice by February 8, 1995 that Howes and Hilb, Rogal had not procured coverage for lead poisoning liability claims, and suffered some degree *372 of harm from this alleged negligence when he retained an attorney on June 24, 1997 to respond to Ms. Gonzalez’s G.L.c. 93A demand letter. Relying on Int’l Mobiles Corp., the Insurance Brokers argue that the limitations clock began to tick when Arsenault retained counsel to respond to the demand letter, which was more than three years before Ms. Gonzalez filed the instant action and more than five years before the Arsenaults filed the third-party complaint. The defendants, however, interpret Int’l Mobiles Cop. too broadly.
In Int’l Mobiles Corp., the insured, a corporation which leased ice cream vans to street vendors, was sued when a five-year-old child was struck by a car as she crossed the street from one its vans to her home in order to obtain more money to purchase ice cream. 29 Mass.App.Ct. at 216-17. The insured was then sued for negligence. Id. The insured’s primary liability insurer assumed the defense but its primary excess coverage insurer in March 1981 denied coverage. Id. In June 1986, after several days of trial, the case was settled for $380,000. Id. at 217. The primary liability insurer paid the first $10,000 and the secondary excess insurer agreed to pay $320,000, but the primary excess insurer refused to pay the balance of $50,000. Id. The insured then filed a negligence claim against its insurance broker for failing to procure the primary excess coverage. Id. at 216-17. The question before the Court was whether the statute of limitations had run prior to the filing of the insured’s negligence claim against the insurance broker. Id.
The Court found that the suit against the insurance broker was timely filed because the limitations period began to run only from the date of the settlement agreement. Id. at 220. The Court reasoned that, since the primary liability insurer had borne the cost of the defense, the insured corporation had suffered no damage from the broker’s alleged negligence until the primary excess insurer refused to pay its share of the settlement agreement. Id. at 219-20. “If no accident produces a claim,” the Court declared, “the failure [to procure insurance] will have been negligence in the abstract.” Id. at 219, citing Rae, 386 Mass. at 193. In most cases, when a broker’s negligence results in a failure to obtain appropriate coverage, the insured sustains appreciable harm when the claim is filed because the insured must retain an attorney to defend the claim. International Mobiles Corp., 29 Mass.App.Ct. at 219. In International Mobiles Corp., however, since the primary liability insurer defended the claim, the insured did not suffer appreciable harm until it was left to pay the primary excess insurer’s share of the settlement. Id. at 219-20.
From this holding, Howes and Hilb, Rogal argue that Int’l Mobiles Corp. stands for the principle that the statute of limitations clock begins to run once the insured incurs any legal expense associated with a threatened claim. Neither the holding nor the reasoning of Int’l Mobiles Corp. supports such a principle. The Court recognized that it would be “unsound judicial policy to encourage the initiation of litigation in anticipation that liability may materialize.” Id. at 220. It did not wish to encourage unhappy insureds pre-emptively to sue their broker as soon as they learned that the broker had failed to procure the necessary coverage, lest they find themselves more than three years later without coverage and with a time-barred broker negligence claim if an uncovered claim were to arise. The Court, therefore, required that the plaintiff suffer “appreciable harm” before the limitations period on a broker negligence claim begins to run. Id. at. 218, 219. While legal expenses potentially may constitute such “appreciable harm,” the Court understood that legal expenses would start the limitations clock only when (1) the legal expenses themselves were “appreciable” or likely to become “appreciable,” and (2) the legal action that triggered the need to incur appreciable legal expenses had been filed, not merely threatened. See id. at 219. Otherwise, the mere threat of legal action regarding an uncovered claim would trigger the preemptive filing of a lawsuit against the insurance broker by the threatened party. Here, each of these two prerequisites were not met until July 28, 2000, when Ms. Gonzalez filed her lead paint poisoning claim. Before then, Arsenault had incurred less than $1,100 in legal fees — a sum too small by itself to justify the considerable expense of a negligence suit against the insurance brokers.
This Court finds, therefore, that Arsenault suffered “appreciable harm” as the result of the Insurance Brokers’ alleged negligence only when Ms. Gonzalez filed her complaint and the Arsenaults were required to undertake the defense of a live, not merely threatened, lawsuit. Since the Arsenaults filed their third-parly complaint on August 16, 2002, less than three years from the filing of Ms. Gonzalez’s claim on July 28, 2000, the Arsenaults’ negligence claims are not barred by the statute of limitations. As a result, the motions for summary judgment as to these claims must be DENIED.[3]
ORDER
For the reasons stated above, this Court hereby ORDERS that:
Hilb, Rogal’s motion for summary judgment on the third party contract claim (Count III) is ALLOWED; and
Howes’ and Hilb, Rogal’s motions for summary judgment on the third party negligence claims (Counts IV and V) are DENIED.

The summary judgment record also refers to this building as 699-709 Moody Street. For the purposes of this motion, the Robbins Street address will be used.

Gonzales lived in Unit 3R from October 1992 to February 1994 and in Unit 2L from February 1994 to March 1995.

In view of this holding, this Court need not reach the question of whether under Mass.R.Civ.P. 15(c) Arsenault’s third-party complaint “relates back” to the date of the original complaint because it concerns the same underlying conduct, transaction, or occurrence as alleged in the original complaint.